UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

PELEUS INSURANCE COMPANY, on its own
behalf and on behalf of Bais Yaakov Dkal Adas
Yereim and BT General Builders, Inc.,

Plaintiff,

-v.-

UNITED SPECIALTY INSURANCE COMPANY,

Defendant.

---

24 Civ. 1398 (KPF)

**OPINION AND ORDER**

---

KATHERINE POLK FAILLA, District Judge:

Plaintiff Peleus Insurance Company ("Peleus" or "Plaintiff") brought this action seeking a declaratory judgment that Defendant United Specialty Insurance Company ("USIC" or "Defendant") is obligated to defend and to indemnify two of Peleus's insureds in an underlying personal injury lawsuit in the Supreme Court of the State of New York, Kings County (the "Underlying Action"). In particular, Peleus argues that its insureds are also "additional insureds" under policies issued by USIC, and seeks reimbursement for past payments made by Peleus in the Underlying Action as well as coverage for defense and indemnification costs going forward. Peleus and USIC have cross-moved for summary judgment on the question of USIC's duty to defend. Given the existence of a material dispute as to whether the relevant agreement with Peleus's insureds was executed before the accident in question, the Court is constrained to deny both sides' motions.

**BACKGROUND**[1]

A.    **Factual Background**

1.    **The Underlying Action**

On May 6, 2022, Jonathan Caceres initiated the Underlying Action by filing a lawsuit in the Supreme Court of the State of New York, Kings County, against BT General Builders, Inc. ("BT") and Bais Yaakov Dkhal Adas Yereim ("Bais"), claiming that he sustained injuries while working at a construction project located at 184-198 Nostrand Avenue, Brooklyn, New York (the "Site"). (*See generally* Underlying Complaint).  Specifically, Mr. Caceres claimed that BT and Bais were negligent in their maintenance and/or supervision of work at the Site, and that they violated Sections 200, 240, and 241(6) of the New York Labor Law.

---

[1]    The facts stated herein are drawn from the parties' submissions in connection with their cross-motions for summary judgment.  The complaint in the Underlying Action is referred to as the "Underlying Complaint" (Dkt. #32-1).  The parties' joint Rule 56.1 Statement of Material Facts is referred to as "Joint 56.1" (Dkt. #32).  Citations to the parties' Rule 56.1 Statement incorporate by reference the documents and deposition testimony cited therein.  *See* Local Rule 56.1(d).

For ease of reference, Peleus's memorandum in support of its motion for summary judgment is referred to as "Peleus Br." (Dkt. #31); USIC's memorandum in support of its motion for summary judgment is referred to as "USIC Br." (Dkt. #34); Peleus's memorandum in opposition to USIC's motion is referred to as "Peleus Opp." (Dkt. #35); and USIC's memorandum in opposition to Peleus's motion is referred to as "USIC Opp." (Dkt. #36).  The AIA Document A401-1997, Standard Form of Agreement between Contractor BT General Builders Inc. and Subcontractor Sandstone Structures, LLC ("Sandstone") dated April 20, 2022, is referred to as the "Sandstone Agreement."  (Dkt. #32-8).  The Commercial General Liability Policy issued by USIC to Sandstone is referred to as the "USIC Policy." (Dkt. #32-9).  The Commercial General Liability Policy issued by Peleus to BT General Builders, Inc. ("BT") and Bais Yaakov Dkhal Adas Yereim ("Bais") is referred to as the "Peleus Policy."  (Dkt. #32-10).  Page references to the USIC and Peleus Policies correspond to the page numbers provided by the Court's Electronic Case Filing ("ECF") system.

At the time of his accident, Mr. Caceres was employed by Charles Contractors Corp. ("Charles"), which was "performing stonework to put together the outside of the building" on the Site. (Joint 56.1 ¶¶ 2-3). On May 2, 2022, Mr. Caceres was carrying a stone slab up a staircase when he slipped on water, lost control of the slab, and suffered injuries when the slab fell on his left foot (the "Accident"). (*Id.* ¶¶ 4-5, Dkt. #32-4 at 24, 28-32).

### 2.      The Relevant Contract Documents

The parties to the instant suit agree that during the relevant time period, Bais owned the Site, and had contracted with BT to serve as construction manager for the construction of a school on the Site. (Joint 56.1 ¶¶ 8-9). BT, in turn, hired Sandstone Structures LLC ("Sandstone") to perform stonework at the Site. (*Id.* ¶ 10).

BT and Sandstone entered into an AIA Document A401-1997, Standard Form of Agreement between Contractor and Subcontractor. (Joint 56.1 ¶ 11; Sandstone Agreement). The Sandstone Agreement recites on its first page that it was "made as of the 20th day of April in the year Two Thousand and Twenty Two" (Sandstone Agreement 1), and reiterates on its signature page that "[t]his Agreement [is] entered into as of the day and year first written above" (*id.* at 14).[2] By its terms, the Sandstone Agreement incorporates, among other things, "this Agreement and all exhibits and schedules annexed hereto" (*id.* at 2, § 1.1),

---

[2]      Of potential note, however, Peleus "has no knowledge about the date the person from Sandstone signed and/or executed the contract between Sandstone and BT." (Joint 56.1 ¶ 54).

and Section 16.1.7 of the Agreement specifically references five exhibits as

"forming part of the Contract Documents":

> Exhibit A - Scope of Work
> Exhibit B - Work Schedule
> Exhibit C - List of Drawings
> Exhibit D - Site Safety Requirements
> Exhibit E - Insurance Requirements

(*Id.* at 13, § 16.1.7).

Section 4.6.1 of the Sandstone Agreement contains Sandstone's

indemnification obligations vis-à-vis BT and Bais:

> In consideration for this Subcontract, and to the fullest extent permitted by law, the Subcontractor shall defend and shall indemnify, and hold harmless, at Subcontractor's sole cost and expense, the Contractor, all entities the Contractor is required to indemnify and hold harmless, the Owner, the Owner's lenders and all other entities the Owner is required to indemnify and hold harmless, and the officers, directors, agents, members, partners, shareholders, employees, successors and assigns of each of them (the "Indemnified Parties") from and against all liabilities or claimed liabilities for bodily injury or death to any person(s), and for any and all liabilities or claimed liabilities for property damage and/or economic damage, including all attorney fees, expert fees, disbursements and related costs, arising out of or resulting from the Work as defined in this Subcontract to the extent such Work was performed by or contracted through the Subcontractor or by anyone for whose acts the Subcontractor may be held liable, excluding only liability created by the sole and exclusive negligence of the Indemnified Parties.   This indemnity agreement shall survive the completion of the Work specified in the Subcontract.   Additionally, the Contractor and Subcontractor shall execute the insurance requirements rider annexed hereto as exhibit "C" and Subcontractor shall comply with the requirements set forth therein.   Subcontractor agrees, upon request of the Contractor subsequent to the execution of this Subcontract, to name such other parties as additional

> insureds and provide sufficient proof of same as necessary to comply with Subcontractor's indemnification and insurance obligations contained in this Subcontract.

(Sandstone Agreement 5, § 4.6.1). In point of fact, the exhibit to the Sandstone Agreement that addresses insurance requirements is Exhibit E, which is titled "Subcontract Agreement Rider (Contractor/Subcontractor)" (the "Insurance Rider" or the "Rider"). (*Id.* at 23-24).

The Insurance Rider begins by reciting that "[t]he terms and conditions of this Rider shall supersede and govern any inconsistent term found in other parts of the written agreement and other riders between the parties." (Sandstone Agreement, Ex. E at p. 1; *see also* Sandstone Agreement 12, § 15.1 ("Where reference is made in this Subcontract to a provision of another Subcontract Document, the reference refers to that provision as amended or supplemented by other provisions of the Subcontract Documents.")). In its first section, titled "Indemnity," the Insurance Rider largely echoes the language of the indemnity provision in Section 4.6.1 of the Sandstone Agreement. In the second section, titled "Insurance," the Insurance Rider specifies, among other things, that Sandstone would obtain appropriate insurance to protect

> the Contractor, all entities the Contractor is required indemnify and hold harmless, the Owner, and their officers, directors, agents and employees, for claims arising out of or resulting from Subcontractor's Work under this Contract Agreement, whether performed by the Subcontractor, or by anyone directly or indirectly employed by Subcontractor, or by anyone for whose acts Subcontractor may be liable.

5

(*Id.* at § 2). Such coverage would involve listing these parties as additional insureds on Sandstone's relevant insurance policies, with coverage on a primary and non-contributory basis, and with BT's and Bais's own insurance policies as excess coverage. (*Id.* at § 2.1). In addition, Sandstone committed to providing BT with "certificate(s) of insurance evidencing the required insurance coverage with the limits stated below or elsewhere in the Subcontract" "[n]ot less than five (5) days prior to commencement of the Work and until final acceptance of the Work." (*Id.* at § 2.3).[3]

The Insurance Rider contains an area to list "Indemnified Parties and Additional Insureds *in addition to* Owner and Contractor"; that area remained blank. (Sandstone Agreement, Ex. E at p. 2 (emphasis in original)). The last portion of the Rider is a signature block for agents of BT and Sandstone. While no date is given for the BT agent's signature, the Sandstone agent's signature is dated May 16, 2022. (*Id.*).[4]

### 3.   The USIC Policy

Sandstone maintained a Commercial General Liability Policy issued by USIC that covered the period from April 20, 2022 (the same date as the

---

[3]   On behalf of Sandstone, Peace of Mind Insurance Brokerage issued certificates of liability insurance, dated April 20, 2022, stating that each of BT and Bais was now "included as an additional insured on a primary and non contributory basis for ongoing and completed operations if required per written contract agreement." (Dkt. #32-16 at 2-3). However, as USIC points out (USIC Br. 9-10), each certificate recites that it "is issued as a matter of information only and confers no rights upon the certificate holder. This certificate does not affirmatively or negatively amend, extend or alter the coverage afforded by the policies below." (Dkt. #32-16 at 2-3 (typeface conventions modified)).

[4]   According to Peleus, the initial version of the Rider that it received was undated. It learned the day before it produced its Rule 30(b)(6) witness of the dated version of the Rider. (Joint 56.1 ¶ 52).

6

Sandstone Agreement), until April 20, 2023.  (USIC Policy 3).  The USIC Policy

is an occurrence (rather than a claims-made) policy, with a limit of $1 million

per occurrence.  (*Id.* at 4).  In its discussion of coverage, the USIC Policy

specifies, in relevant part:

> SECTION I - COVERAGES
>
> COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY
>
> 1. Insuring Agreement
>
> a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.

(*Id.* at 6).  The USIC Policy also contains a "Blanket Additional Insurance"

endorsement that provides:

> It is agreed that this Policy shall include as additional Insureds any person or organization to whom the Named Insured has agreed by written and executed contract to provide coverage, but only with respect to operations performed by or on behalf of the Named Insured and only with respect to occurrences subsequent to the execution of such contract.
>
> THE INCLUSION OF AN ADDITIONAL INSURED SHALL BE SUBJECT TO ALL OTHER TERMS AND CONDITIONS CONTAINED IN THIS POLICY.

(*Id.* at 42).

With particular respect to priority of coverage, the USIC Policy contains

the following provision:

7

4. Other Insurance

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages A or B of this Coverage Part, our obligations are limited as follows:

a. Primary Insurance

This insurance is primary except when b. below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary.   Then, we will share with all that other insurance by the method described in Paragraph c. below.

(USIC Policy 16).  This provision, in turn, is qualified by a subsequent endorsement to the Policy:

PRIMARY AND NON-CONTRIBUTORY

Where required by written contract, it is agreed that this policy shall be primary to any insurance carried by an additional insured, and any insurance carried by such additional insured shall not be called upon to contribute to any claim covered under this policy, provided that the claim arises directly from work performed by the Named Insured or others working directly on behalf of the Named Insured and provided further that the "occurrence" that gives rise to such claim happened subsequent to the execution of the written contract.

It is warranted that whenever the Named Insured has agreed by written contract to be primary to any insurance carried by an additional insured, the Named Insured will require by written contract that the Commercial General Liability policy of any contractor or subcontractor of the Named Insured will be primary to any insurance carried by the Named Insured and that the Named Insured's Commercial General Liability policy shall not be called upon to contribute to any claim covered under any policy of such contractor or subcontractor.

(*Id.* at 64).

### 4.    The Peleus Policy

BT and Bais were named insureds on a Commercial General Liability

Policy issued by Peleus that provided, as relevant here, that:

> 4. Other Insurance
>
> If other valid and collectible insurance is available to the insured for a loss we cover under Coverages A or B of this Coverage Part, our obligations are limited as follows:
>
> a. Primary Insurance
>
> This insurance is primary except when Paragraph b. below applies.    If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary.    Then, we will share with all that other insurance by the method described in Paragraph c. below.
>
> b. Excess Insurance
>
> (1) This insurance is excess over:
>
> ***
>
> (b) Any other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured.

(Peleus Policy 21-22).

### B.    Procedural History

Peleus received notice of Mr. Caceres's injury and the consequent

Underlying Action on May 19, 2022.  (Joint 56.1 ¶ 29).  Since May 25, 2022, it

has provided a defense to BT and Bais under a reservation of rights.  (*Id.*

¶¶ 30-32).

In June 2022, Peleus advised USIC of its position that BT and Bais "are entitled to a defense and full indemnity as well as additional insured status regarding this claim under the Commercial General Liability Policy issued by United Specialty Insurance to Sandstone." (Joint 56.1 ¶ 45). By letter dated October 7, 2022, USIC — through its third-party claims administrator, National Claim Services ("NCS") — advised Peleus that "USIC cannot agree to accept [BT and Bais] as additional insureds or defend or indemnify [BT and Bais] in the claim presented by Jonathan Caceres." (*Id.* ¶ 46). Among other reasons, NCS cited the absence of a "written contract executed prior to the date of the occurrence," which prompted Peleus to forward to NCS a copy of the Sandstone Agreement. (*Id.* ¶¶ 47-48). USIC has continued to deny additional insured coverage for BT and Bais.

Peleus filed the instant declaratory judgment action on February 23, 2024, seeking defense and indemnification for BT and Bais under the USIC Policy. (Dkt. #1). USIC filed its answer on April 24, 2024. (Dkt. #14). No initial pretrial conference was held in the matter; instead, the parties proceeded directly to discovery. (Dkt. #16 (endorsement adjourning conference *sine die*); Dkt. #17 (endorsed case management plan)). After the discovery deadlines were extended several times by the Court (*see* Dkt. #19, 21), the parties appeared for a pretrial conference on December 24, 2024 (*see* Dkt. #24-25 (pre-conference submissions from the parties)), at which time they previewed for the Court their intention to file cross-motions for summary judgment on the issue of USIC's duty to defend.

Briefing on the motions was ordered to be simultaneous. Peleus filed its opening submissions in support of its motion for summary judgment on March 6, 2025 (Dkt. #30-32), and USIC filed its corresponding opening submissions on March 7, 2025 (Dkt. #33-34). Both sides filed their opposition submissions on April 18, 2025 (Dkt. #35 (Peleus), 36 (USIC)).

**DISCUSSION**

**A. Applicable Law**

**1. Motions for Summary Judgment Under Federal Rule of Civil Procedure 56**

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"It is the movant's burden to show that no genuine factual dispute exists" and a court "must resolve all ambiguities and draw all reasonable inferences in the non-movant's favor." *Vt. Teddy Bear Co., Inc.* v. *1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004). If the movant has met its burden, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts" and, toward that end, "must come forward with specific facts showing that there is a genuine issue for trial."

11

*Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (internal citations, quotation marks, and emphasis omitted).  The nonmoving party may not rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment."  *Knight* v. *U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986).  "Where there are cross-motions, each motion must be evaluated separately, with the appropriate inferences drawn as to each movant."  *Prokos* v. *Full Stack LLC*, No. 23 Civ. 4960 (MMG), 2026 WL 572539, at *1 (S.D.N.Y. Mar. 2, 2026); *accord Walker* v. *Carrozzo*, 664 F. Supp. 3d 490, 505 (S.D.N.Y. 2023) (quoting *Byrne* v. *Rutledge*, 623 F.3d 46, 53 (2d Cir. 2010)).

### 2.    Interpretation of Insurance Contracts

"Insurance policies are, in essence, creatures of contract, and, accordingly, subject to principles of contract interpretation."  *Porco* v. *Lexington Ins. Co.*, 679 F. Supp. 2d 432, 435 (S.D.N.Y. 2009) (quoting *In re Ests. of Covert*, 97 N.Y.2d 68, 76 (2001) (internal quotation marks omitted)).  Under New York law,[5] the interpretation of a contract "is a matter of law for the court to decide."  *Int'l Multifoods Corp.* v. *Com. Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002) (internal citation omitted); *see also Parks Real Est. Purchasing Grp.* v. *St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 42 (2d Cir. 2006) ("[T]he initial

---

[5]    The parties do not dispute that New York law governs their coverage disputes.  (*See* Peleus Br. 5 ("Under well-established New York law...."); USIC Br. 5 (citing New York cases)).  The parties' "implied consent ... is sufficient to establish choice of law." *Krumme* v. *WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000) (internal quotation marks omitted); *see also Valentini* v. *Grp. Health Inc.*, No. 20 Civ. 9526 (JPC), 2021 WL 2444649, at *6 (S.D.N.Y. June 15, 2021) ("The parties do not dispute that New York law applies in this case, and the Court accordingly applies that law."), *aff'd*, No. 22-157, 2023 WL 2027273 (2d Cir. Feb. 16, 2023) (summary order).

interpretation of a contract is a matter of law for the court to decide." (internal quotation marks and citation omitted)).

"As with the construction of contracts generally, unambiguous provisions of an insurance contract must be given their plain and ordinary meaning[.]" *Gilbane Bldg. Co./TDX Constr. Corp.* v. *St. Paul Fire & Marine Ins. Co.*, 31 N.Y.3d 131, 135 (2018) ("*Gilbane II*") (quoting *Vigilant Ins. Co.* v. *Bear Stearns Cos., Inc.*, 10 N.Y.3d 170, 177 (2008) (internal quotation marks omitted)). "If the agreement on its face is reasonably susceptible of only one meaning, a court is not free to alter the contract to reflect its personal notions of fairness and equity." *White* v. *Cont'l Cas. Co.*, 9 N.Y.3d 264, 267 (2007) (quoting *Greenfield* v. *Philles Records*, 98 N.Y.2d 562, 570 (2002) (internal quotation marks omitted)). "If the terms of a policy are ambiguous, however, any ambiguity must be construed in favor of the insured and against the insurer." *Id.*

### 3.   The Duty to Defend

"The duties to defend and indemnify are separate and distinct; the former is a form of litigation insurance for the insured." *Barney Greengrass, Inc.* v. *Lumbermens Mut. Cas. Co.*, 445 F. App'x 411, 413 (2d Cir. 2011) (summary order) (internal quotation marks and citations omitted). Under New York law, "the duty of an insurer to defend its insured is 'exceedingly broad' and far more expansive than the duty to indemnify its insured." *High Point Design, LLC* v. *LM Ins. Corp.*, 911 F.3d 89, 94-95 (2d Cir. 2018) (quoting *Cont'l Cas. Co.* v. *Rapid-Am. Corp.*, 80 N.Y.2d 640, 648 (1993)); *accord Regal Constr. Corp.* v. *Nat'l*

*Union Fire Ins. Co. of Pittsburgh*, 15 N.Y.3d 34, 37 (2010). "[T]he insurer's duty to provide a defense is invoked 'whenever the allegations in a complaint against the insured fall within the scope of the risks undertaken by the insurer, regardless of how false or groundless those allegations might be.'" *High Point Design, LLC*, 911 F.3d at 95 (quoting *Seaboard Sur. Co.* v. *Gillette Co.*, 64 N.Y.2d 304, 310 (1984)). Thus, "the general rule in determining whether an insurer has a duty to defend is to compare the allegations of the complaint with the operative insurance policy." *Int'l Bus. Machs. Corp.* v. *Liberty Mut. Ins. Co.*, 363 F.3d 137, 148 (2d Cir. 2004).

An insurer must defend even if "facts outside the four corners of those pleadings indicate that the claim may be meritless or not covered[.]" *Int'l Bus. Machs. Corp.* v. *Liberty Mut. Fire Ins. Co.*, 303 F.3d 419, 427 (2d Cir. 2002) (quoting *Fitzpatrick* v. *Am. Honda Motor Co.*, 78 N.Y.2d 61, 63 (1991) (internal quotation marks omitted)). "If the allegations of the complaint are even potentially within the language of the insurance policy, there is a duty to defend." *High Point Design, LLC*, 911 F.3d at 95 (quoting *Town of Massena* v. *Healthcare Underwriters Mut. Ins. Co.*, 98 N.Y.2d 435, 443 (2002) (internal quotation marks omitted)).

That said, "[t]he insurer's duty to defend is ... not an interminable one, and will end if and when it is shown unequivocally that the damages alleged would not be covered by the policy." *Sturges Mfg. Co.* v. *Utica Mut. Ins. Co.*, 37 N.Y.2d 69, 74 (1975). In other words, where an insurer's duty to defend turns on an unresolved factual dispute, "the duty to defend lasts only until the

14

factual ambiguity is resolved in favor of the insurer." *Hugo Boss Fashions, Inc. v. Fed. Ins. Co.*, 252 F.3d 608, 622 (2d Cir. 2001); *see also Avondale Indus., Inc. v. Travelers Indem. Co.*, 774 F. Supp. 1416, 1425 (S.D.N.Y. 1991) (The "duty to defend continues until judicial determination, either in [the] underlying action or in [the] coverage action, of [the] issue relevant to coverage." (citing *Colon* v. *Aetna Life & Cas. Ins. Co.*, 66 N.Y.2d 6, 10 (1985))).

## B.    Genuine Disputes of Material Fact Exist Concerning the Execution Date of the Sandstone Agreement

The parties do not seriously dispute that, *if* the Court finds that BT and Bais qualify as additional insureds under the USIC Policy, USIC would have a duty to defend them in the Underlying Action.  Instead, the parties dispute the antecedent question of whether BT and Bais qualify as additional insureds under the USIC Policy.  On this record, the Court cannot make a conclusive determination.

To review, the USIC Policy includes as additional insureds

> any person or organization to whom the Named Insured has agreed by written and executed contract to provide coverage, but only with respect to operations performed by or on behalf of the Named Insured and only with respect to occurrences subsequent to the execution of such contract.

(USIC Policy 42).  The Second Circuit has observed that New York law "requires either the signing of a contract or its full performance for it to be 'executed' within the meaning of an insurance policy requiring such prior execution[.]" *10 Ellicott Square Court Corp.* v. *Mountain Valley Indem. Co.*, 634 F.3d 112, 121 (2d Cir. 2011); *see Empire Builders & Developers, Inc.* v. *Delos Ins. Co.*, 910

15

N.Y.S.2d 548, 549 (2d Dep't 2010) ("[T]he endorsement's further requirement that the agreement be 'executed' prior to the loss for which coverage is sought was not satisfied, since the agreement was neither reflected in a signed document … nor fully performed by the parties." (internal citations omitted)). Neither side suggests that this language is ambiguous, and New York courts have repeatedly held that the term "executed" is unambiguous when used in this context. *See Burlington Ins. Co.* v. *Utica First Ins. Co.*, 896 N.Y.S.2d 433, 435 (2d Dep't 2010) ("[T]he term 'executed' in the additional insured endorsement does not render the policy ambiguous.").

USIC argues that there is no evidence of a "written and executed contract to provide coverage" before the date of the Accident. (USIC Br. 5-8). Peleus disagrees, citing the Sandstone Agreement, where Sandstone committed to indemnifying BT and Bais, and, more specifically, to executing the Insurance Rider specifying the requisite insurance requirements, *viz.*, naming BT and Bais as additional insureds entitled to coverage on a primary and non-contributory basis. (Peleus Br. 8-10). The problem is that a triable dispute exists concerning the date on which the Sandstone Agreement was executed.

The Sandstone Agreement recites on its first page that it was "made *as of* the 20th day of April in the year Two Thousand and Twenty Two" (Sandstone Agreement 1 (emphasis added)), and reiterates on its signature page that "[t]his Agreement [is] entered into *as of* the day and year first written above" (*id.* at 14 (emphasis added)). Peleus considers these recitals to be dispositive of the issue, but in so arguing misperceives their legal significance. (Peleus Br. 1-2,

8-10; Peleus Opp. 2-3).  In point of fact, these recitals do not mean that the Sandstone Agreement was executed on April 20, 2022, prior to Mr. Caceres's alleged Accident.  It is true that under New York law, "where parties to an agreement expressly provide that a written contract be entered into 'as of' an earlier date than that on which it was executed, the agreement is effective retroactively 'as of' the earlier date and the parties are bound thereby accordingly."  *Colello* v. *Colello*, 780 N.Y.S.2d 450, 453 (4th Dep't 2004) (internal quotation marks omitted) (quoting *Matthews* v. *Jeremiah Burns, Inc.*, 129 N.Y.S.2d 841, 847 (Sup. Ct. 1954)) (collecting cases); *accord McKenzie-Morris* v. *V.P. Recs. Retail Outlet, Inc.*, No. 22 Civ. 1138 (GHW), 2022 WL 18027555, at *9 (S.D.N.Y. Dec. 30, 2022); *U.S. Bank, N.A.* v. *Squadron VCD, LLC*, No. 10 Civ. 5484 (VB), 2011 WL 4582484, at *5 (S.D.N.Y. Oct. 3, 2011), *aff'd*, 504 F. App'x 30 (2d Cir. 2012) (summary order); *cf. Guthorn* v. *Vill. of Saranac Lake*, 95 N.Y.S.3d 417, 420 (3d Dep't 2019) ("An indemnification agreement that is executed after a plaintiff's accident, therefore, may only be applied retroactively where it is established that (1) the agreement was made as of a date prior to the accident and (2) the parties intended the agreement to apply as of that prior date[.]" (collecting cases)).  However, it is equally true that "parties to a contract cannot make it retroactively binding to the detriment of third persons."  *In re Tronox Inc.*, 503 B.R. 239, 267 (Bankr. S.D.N.Y. 2013) (quoting *In re Tronox Inc.*, 429 B.R. 73, 99 (Bankr. S.D.N.Y. 2010)) (collecting cases).  In other words, BT and Sandstone would be permitted to backdate the Sandstone Agreement, but not to bind USIC by such backdating.

17

The evidence concerning the execution date of the Sandstone Agreement raises genuine disputes of material fact. As support for its argument of execution on or about April 20, 2022, Peleus points to the date on the Agreement, which coincides with the dates of both the USIC Policy and the Certificates of Insurance (*See* USIC Policy 3; Dkt. #32-14 at 57-60; Joint 56.1 ¶¶ 18 (USIC Policy), 40-44 (certificates of insurance)).[6] And as a practical matter, the Court finds it difficult to believe that BT would have allowed the project to commence — or, conversely, that Sandstone and its sub-sub-contractors would have begun work on the project — without ensuring that the requisite subcontracts were in place. Relatedly, the USIC Policy was an occurrence, and not a claims-made, policy, such that the parties to the

---

[6]     As summarized by another court in this Circuit:

> Under New York law, "[a] certificate of insurance is merely evidence of a contract for insurance, not conclusive proof that the contract exists, and not, in and of itself, a contract to insure." *Horn Maint. Corp.* v. *Aetna Cas. & Sur. Co.*, 225 A.D.2d 443, 444 (1st Dep't 1996). However, the New York Appellate Courts are divided on whether "a certificate of insurance can estop an insurance provider from denying coverage." *10 Ellicott Square Ct. Corp.*, 634 F.3d at 122-23 (collecting cases). The Third and Fourth Departments have found that a certificate of insurance estops the insurer from denying coverage, even where that certificate expressly disclaims that it provides coverage, "if the certificate was issued by an agent within the scope of its authority, and ... the party seeking coverage reasonably relied on the certificate." *Id.* at 122; *see also Sevenson Env't Servs., Inc.* v. *Sirius Am. Ins. Co.*, 74 A.D.3d 1751, 1753 (4th Dep't 2010) (holding that "an insurance company that issues a certificate of insurance naming a particular party as an additional insured may be estopped from denying coverage to that party"). By contrast, the First and Second Departments have "been reluctant to find estoppel based on a certificate of insurance." *10 Ellicott Square Ct. Corp.*, 634 F.3d at 122.

*MingJi Ave4 Realty, LLC* v. *Colony Ins. Co.*, No. 23 Civ. 7848 (ARR) (PK), 2025 WL 871660, at *11 (E.D.N.Y. Mar. 20, 2025), *appeal withdrawn*, No. 25-984, 2025 WL 2047401 (2d Cir. May 21, 2025). Peleus does not advance an estoppel argument in its briefing, and the Court accordingly does not address the issue further. (*See* Peleus Br.; Peleus Opp.).

Sandstone Agreement would have been incentivized to resolve any coverage issues before construction began.  On the other hand, despite the ease with which it could obtain this information from its insureds — and thereby resolve the issue once and for all — Peleus (i) "did not contact Chaim Fuchs, of BT, to ask him the date he signed the contract between BT and Sandstone" and (ii) "has no knowledge about the date the person from Sandstone signed and/or executed the contract between Sandstone and BT."  (Joint 56.1 ¶¶ 53-54).

Other evidence suggests a different date for the execution of the Sandstone Agreement.  The insurance requirements rider is dated May 16, 2022, which is of course after the Accident occurred.  (Joint 56.1 ¶ 17).  It is also troubling to the Court that when Peleus was first advised of the Accident and the Underlying Action and requested documents, it was given a copy of the Insurance Rider in which the May 16, 2022 date was quite obviously redacted. (*Id.* ¶¶ 33-36).  Given this contradictory evidence, the Court cannot find the date of execution of the Sandstone Agreement as a matter of law.[7]

Noting that Peleus has the burden of proving an entitlement to coverage, USIC argues that its failure to discharge that burden means that "no additional insured coverage can be conferred."  (USIC Br. 5).  But the fact that the Court

---

[7]     The Court recognizes that federal and state courts in New York have found that New York law "requires either the signing of a contract *or its full performance* for it to be 'executed' within the meaning of an insurance policy requiring such prior execution[.]" *10 Ellicott Square Court Corp.* v. *Mountain Valley Indem. Co.*, 634 F.3d 112, 121 (2d Cir. 2011) (emphasis added); *see also Empire Builders & Developers, Inc.* v. *Delos Ins. Co.*, 910 N.Y.S.2d 548, 549 (2d Dep't 2010).  However, Peleus does not advance the argument that Sandstone's full performance of the Sandstone Agreement amounts to the Agreement's execution, and thus the Court does not consider this line of precedent.

19

is unable to grant Peleus's motion does not mean that it must grant USIC's cross-motion — Peleus has raised a triable issue, even if it has not proven that issue as a matter of law.

More pointedly, USIC claims that summary judgment is warranted in its favor because the Insurance Rider included as Exhibit E to the Sandstone Agreement does not appear to have been executed until May 16, 2022 — or two weeks after the Accident — when it was signed by Sandstone's principal Abe Waldman. (USIC Br. 1, 5-8; Insurance Rider 2). USIC's argument, however, reveals a second level of ambiguity that forecloses summary judgment at this time.

As noted, for BT and Bais to be considered additional insureds under the USIC Policy, Sandstone was obligated to "agree[ ] by written and executed contract to provide coverage" before the date of the Accident (USIC Policy 42). Peleus argues that Sandstone did just that by executing the Sandstone Agreement. In this regard, the Court agrees with Peleus that the Sandstone Agreement specifically references and incorporates the Insurance Rider. (Peleus Br. 3-4, 8-9). Similarly, the Court does not perceive any inconsistencies between the Sandstone Agreement and the Insurance Rider, such that the Rider language modified the Agreement. (Peleus Opp. 4).

The fact remains, however, that the key language in the indemnification provision of Section 4.6.1 of the Sandstone Agreement is ambiguous: "Additionally, the Contractor and Subcontractor shall execute the insurance requirements rider annexed hereto as exhibit ['E'] and Subcontractor shall

20

comply with the requirements set forth therein." (Sandstone Agreement 5, § 4.6.1). The ambiguity concerns the import of signing the Insurance Rider. Put simply, the record before the Court is ambiguous as to whether the parties to the Sandstone Agreement believed that they had agreed to be bound by *all* of its provisions, including its exhibits, simply by signing the Agreement (such that signing the Insurance Rider was a ministerial act or, at most, a condition subsequent); or whether the parties intended the issue of insurance coverage to be effective only upon signing of the Insurance Rider (such that the Rider was a condition precedent to additional insured coverage).[8]

Once again, the evidence in the record points both ways. The fact that the USIC Policy (and the correlative COIs) are dated April 20, 2022, suggests strongly that the parties to the Sandstone Agreement intended to be bound to all facets of the indemnification provision at the time the Agreement (and not the Insurance Rider) was executed. The common-sense arguments enumerated above regarding project commencement and occurrence policies have equal force in this analysis. And yet no one has explained to the Court why the Insurance Rider has a separate signature block, and why it was signed — at least by one party — one month after the rest of the Agreement.

The Court is aware that the bar for finding a provision to be a condition precedent is high. *See, e.g., Thomas & Betts Corp.* v. *Trinity Meyer Util. Structures, LLC*, No. 20-2904, 2021 WL 4302739, at *2 (2d Cir. Sept. 22, 2021)

---

[8]     The Court pauses to emphasize that it is *not* finding that the USIC Policy is ambiguous, but only that the Sandstone Agreement that could trigger additional insured coverage is.

(summary order) (discussing customary "linguistic conventions" of a condition precedent, as well as the presumption against reading condition precedent into an agreement); *Sohm* v. *Scholastic Inc.*, 959 F.3d 39, 45-46 (2d Cir. 2020) (distinguishing covenants from conditions precedent under New York law), *abrogated on other grounds by, Warner Chappell Music, Inc.* v. *Nealy*, 601 U.S. 366 (2024); *Mt. Hawley Ins. Co.* v. *Beach Cruiser, LLC*, No. 22 Civ. 10354 (GHW), 2025 WL 723365, at *7 n.5 (S.D.N.Y. Mar. 6, 2025) ("Generally speaking, New York respects a presumption that terms of a contract are covenants rather than conditions, and the law ... demands that conditions precedent be expressed in unmistakable language" (quotation marks omitted) (first quoting *Graham* v. *James*, 144 F.3d 229, 237 (2d Cir. 1998); and then quoting *Bank of New York Mellon Tr. Co.* v. *Morgan Stanley Mortg. Cap., Inc.*, 821 F.3d 297, 305 (2d Cir. 2016))).  However, in the absence of record evidence regarding the intent of the parties to the Sandstone Agreement, the Court cannot determine whether execution of that Agreement reflected the parties' intent to be bound to all of its terms, including its exhibits.

In short, Peleus has not proved, nor has USIC disproved, that BT and Bais qualify as additional insureds under the USIC Policy for two separate reasons, one temporal and one intent-based.  In the absence of a more developed factual record, resolution of that issue will have to wait until trial.

22

## CONCLUSION

For the foregoing reasons, the Court DENIES Peleus's motion for summary judgment concerning USIC's duty to defend BT and Bais in the Underlying Action and DENIES USIC's cross-motion for same.  The Clerk of Court is directed to terminate the motions pending at docket entries 30 and 33.

The parties remaining in the case are directed to submit a joint letter addressing next steps in the case on or before **April 17, 2026**.

SO ORDERED.

Dated:       March 23, 2026
             New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

23